**THE BROWN LAW FIRM, P.C.**
Timothy W. Brown, Esq.
 Email: tbrown@thebrownlawfirm.net
127A Cove Road
Oyster Bay Cove, New York 11771
Telephone: (516) 922-5427

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NEIL J. BROWN,  DERIVATIVELY AND ON BEHALF OF  FORCEFIELD ENERGY, INC., | Case No. CV-15-2782 |
| Plaintiff, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR:** |
| v. | **(1) BREACH OF FIDUCIARY DUTY; AND**<br>**(2) UNJUST ENRICHMENT** |
| RICHARD ST-JULIEN, DAVID NATAN, JASON WILLIAMS, DAVID VANDERHORST, ADRIAN AUMAN, And KÉBIR RATNANI, | **JURY TRIAL DEMANDED** |
| Defendants, | |
| And | |
| FORCEFIELD ENERGY, INC., | |
| Nominal Defendant. | |

Plaintiff Neil J. Brown ("Plaintiff"), by his undersigned attorneys, derivatively and on

behalf of Nominal Defendant ForceField Energy, Inc. ("ForceField" or the "Company"), files this

1

Verified Shareholder Derivative Complaint against Defendants Richard St-Julien, David Natan, Jason Williams, David Vanderhorst, Adrian Auman, and Kébir Ratnani (collectively, the "Individual Defendants") for breaches of their fiduciary duties as directors and/or officers of ForceField and unjust enrichment for his complaint against Individual Defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, the criminal complaint filed against Defendant Richard St-Julien in the United States District Court for the Eastern District of New York, wire and press releases published by and regarding ForceField, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a shareholder derivative action that seeks to remedy wrongdoing committed by ForceField's directors and officers who breached their fiduciary duties by A) engaging in a scheme to manipulate the price and trading volume of ForceField's stock by using undisclosed nominee accounts to purchase and sell the stock and by using stock promoters and broker dealers who failed to disclose to potential investors that they had been paid by the Individual Defendants to promote the purchase of the stock and whose reports were reviewed by ForceField's management before publication; B) by failing to maintain for the Company

adequate internal and financial controls; and C) by making false and misleading statements by failing to disclose to the investing public 1) the above scheme, 2) that members of ForceField's management have troubling histories with fraudulent companies, and 3) that the Company lacked adequate internal and financial controls.

2.      ForceField is a designer, distributor and licensee of alternative energy products and solutions. The Company distributes light emitting diode ("LED") commercial lighting and fixtures.  It also uses waste heat from manufacturing source to provide clean electricity.

3.      On April 15, 2015, a *Seeking Alpha* article was published (the "*Seeking Alpha* Exposé") that stated that "ForceField Energy is a stock promotion pure and simple" and that "[t]he company has been engaging paid promoters to issue a series of upbeat reports on its prospects which has successfully powered the stock higher."  In addition, the *Seeking Alpha* Exposé stated that ForceField Energy's "[m]anagement has a troubling history of involvement with fraudulent companies, misleading investors and the ability to shift money around in international locations such as Costa Rica, where ForceField continues to maintain the bulk of its operations."

4.      On April 20, 2015 the U.S. Attorney's Office for the Eastern District of New York issued a press release revealing more details about the Company's stock promotion fraud and the criminal activities of the Company's Executive Chairman of the Board and majority shareholder, Defendant Richard St-Julien's ("St-Julien"), stating that Defendant St. Julien "was arrested late Friday evening on charges of securities fraud conspiracy.  The arrest occurred as St. Julien was preparing to board a plane in Ft. Lauderdale bound for Costa Rica."

5.      The U.S. Attorney's Office press release stated that, according to its complaint filed in the United States District Court for the Eastern District of New York, "since approximately August 2012, St. Julien and his co-conspirators engaged in a scheme to manipulate the price and trading volume of ForceField's stock by using undisclosed nominee accounts, including an account held by a dermatologist in Boulder, Colorado, to purchase and sell the stock, and through the use of stock promoters and broker dealers who failed to disclose to potential investors that they had been paid by St. Julien to promote the purchase of the stock."

6.      The U.S. Attorney's Office press release stated that "St. Julien did not disclose his ownership and control of the shares purchased through nominees and used offshore banks, including in Belize, to pay the nominees to conceal his ownership and control. St. Julien coordinated the purchases by telephone and text messages."

7.      The U.S. Attorney's Office press release explained that "St. Julien and his co-conspirators deceived the investing public by creating the appearance of genuine trading volume and interest in ForceField's stock, and as a result, from approximately January 2014 to April 2015, the price of the stock rose from a low of $4.55 per share to a high of $7.82 per share."

8.      On April 19, 2015 Defendant St-Julien resigned as the Executive Chairman of the Board and all other positions at the Company.  On the same date, Defendant David Natan, the Company's Chief Executive Officer, was appointed to also serve as the Company's Chairman of the Board and Corporate Secretary.

9.      On April 20, 2015, NASDAQ Capital Market halted trading in the Company's stock.

10.     On April 21, 2015, the SEC issued an Order of Suspension of Trading of the Company's stock.

11.     On the same day, the Company received a subpoena for the production of documents and information pursuant to a Formal Order of Investigation from the SEC staff.

12.     Since the *Seeking Alpha* Exposé was published, three federal securities law class action lawsuits have been filed in the United States District Court for the Southern District of New York against the Company and Defendants St-Julien and Natan.

13.     As a result of the Individual Defendants' illicit scheme and false and misleading statements, the price of ForceField stock, plummeted from a high of over $7.80 per share during intraday trading on April 14, 2015 to close at $3.11 per share on April 20, 2015 after NASDAQ halted trading of the Company's stock.

14.     The Individual Defendants' breaches of fiduciary duty have subjected the Company, the Company's Chief Executive Officer and current Chairman, the Company's Chief Financial Officer, and the Company's Executive Chairman at the time the first of them was filed to multiple federal securities fraud class action lawsuits, to the SEC investigation and subpoena, to criminal charges against and arrest of the Company's Executive Chairman at the time, to NASDAQ's halting of trading of Company stock, to the SEC's suspension of trading of Company stock, to the need to undertake internal investigations, to losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company, including through bonuses connected to the Individual Defendants' scheme of intentional misconduct and false and misleading statements that were made intentionally, and will cost the Company going forward many millions of dollars.

15.     The Company has been substantially damaged as a result of the Individual Defendants' knowing breaches of fiduciary duty and other misconduct.

16.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants who are the Company's current Directors, of the substantial likelihood of their liability in this derivative action, federal securities law class action lawsuits, SEC investigation, and the U.S. attorney's office prosecution and FBI investigation, of their not being disinterested and/or independent Directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

17.     Diversity jurisdiction is conferred by 28 U.S.C. § 1332.  Plaintiff and Individual Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

18.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or is an individual who is a citizen of New York or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

19.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

- 6 -

## PARTIES

20.     Plaintiff is a current shareholder of shares of ForceField.   Plaintiff has continuously held ForceField common stock at all relevant times.  Plaintiff is a citizen of Utah.

21.     Nominal Defendant ForceField is a Nevada corporation with principal executive offices located in this District at 245 Park Avenue, 39th Floor, New York, New York 10167.  According to the Company,

> ForceField Energy Inc. and its subsidiaries comprise a global company whose products and solutions focus on sustainable energy solutions and improved energy efficiency. ForceField is a distributor of LED lighting products for a number of premier LED lighting manufacturers; and through its subsidiary American Lighting, is an award winning-contractor that has completed lighting installations for numerous high profile concerns in a variety of industries. ForceField is also a licensee of modular, heat recovery systems that convert waste heat into clean electricity. Its patented technology is based upon the Organic Rankine Cycle (ORC) and uses proprietary, multiple-component fluids that are environmentally sound.

In March of 2013, the company formed a subsidiary in Costa Rica. Until the Company's acquisition of American Lighting ("ALD") on April 25, 2014, the Company stated that "All of the Company's long-lived assets are located in Costa Rica."  ForceField is a citizen of New York and Nevada.

22.     Defendant Richard St-Julien ("St-Julien") served as the Company's Executive Chairman of the Board of Directors, Vice President, Chief Legal Officer, and Secretary until he resigned from each of those positions on April 19, 2015.  According to the Company's Form 10-K/A filed with the SEC on April 30, 2015, as of that day, Defendant St-Julien owned 3.05 million shares of the Company's common stock, which is 17.19% of the Company's issued and outstanding common stock.

23.     The Company's proxy statement filed with the SEC on April 30, 2014 ("2014 Proxy Statement") stated the following about Defendant St-Julien:

> Mr. ST Julien has been a Director, Secretary and Chief Legal Officer of the Company since 2009 and Chairman of the Board of Directors since October 2011.  Mr. ST Julien holds a Bachelor of Law from the University of Ottawa. Since 1992, he has been a practicing attorney in the areas of Commercial and International Law. Simultaneously, he has been involved in numerous business ventures as entrepreneur in Canada, in the United States as well as in other countries. Mr. ST Julien specializes in both International Business Law and Securities law in collaboration with strategic partners in Canada in the USA and in China. He possesses several years of experience in the public company environment, mostly in the USA, where he was involved in various listings, reorganizations, financings and acquisitions. Additionally, he acts as a consultant to corporations in their business ventures, including international financing. Finally, Mr. ST Julien has held positions in various public companies, such as secretary and member of the board of directors and officers.

24.     The *Seeking Alpha* Exposé, however, disclosed the following additional sordid facts about Defendant St-Julien's past:

> Mr. St. Julien appears to be an expert at moving money around in places such as (again, **no coincidence**) **Costa Rica**. **Costa Rica** is, of course, where ForceField ended up establishing its operations and where 100% of its assets were located until 2014.

> In 2009, Mr. St. Julien was working as a lawyer in **Costa Rica** helping to funnel cash to and from convicted fraudster Jean LaFleur who was running a fraudulent scheme in Belize.

> The Canadian federal government was suing LaFleur for $7 million for his role in a government sponsorship scandal. According to the Globe and Mail:

> "Federal lawyers allege in the court documents that Mr. Lafleur 'tried to liquidate his assets when it became obvious that [the government] would undertake legal action to recoup money that it had paid to [Mr. Lafleur] as part of his fraudulent scheme.'… Mr. Lafleur said as part of his bankruptcy proceedings that he called on Mr. St-Julien to invest the money on his behalf in Liechtenstein, the Caribbean and Belize… **Mr. St-Julien** is a member of the Quebec bar, but he is working in Costa Rica, and has **refused to explain** what happened to $460,000 from the house sale that was invested in his Belize company, Parameter, which is now insolvent."

> LaFleur was ultimately sent to prison for his role, but the money disappeared.

(Emphasis in original.)

25.    Plaintiff's investigation also revealed that Defendant St-Julien's background information in the 2014 Proxy Statement failed to disclose his having been vice president, secretary, and director at Terra Nostra Resources Corp. ("Terra Nostra") from November 2003 to April 2005.  Other managers of ForceField served at Terra Nostra, too.  Defendant Ratnani was a Terra Nostra director from August 2002 to April 2005.  Daniel Julien, another director at Terra Nostra, was ForceField's Chief Accounting Officer and Chief Financial Officer until February 9, 2010.  According to an article entitled "Fund's Chinese Stake Stirs Some Questions," published in the *New York Post* on October 31, 2007, Terra Nostra's management were involved with "some spectacular failures" and have a history of violating securities laws through making false public statements and **trading Terra Nostra stock through nominees without disclosing it**.  Another article, published on *Reuters* on November 26, 2008, and entitled "Noteholders petition for Terra Nostra bankruptcy," stated that Terra Nostra's entire executive team were terminated or resigned and that the company filed for bankruptcy.

26.    Additionally, Plaintiff's investigation revealed Defendant St-Julien was the vice president and the chief legal officer from June 2007 through September 2009 or later at Methes Energies International Ltd. ("Methes").  Others in management at ForceField served at Methes, too. Defendant Ratnani is and has been since September 2008 a director of Methes, and Daniel Julien was the chief accounting officer from June 2007 through September 2009 or later.  Michel G. Laporte is the chairman, chief executive officer, and treasurer of Methes, and owns 7.1% of Methes common stock as of March 11, 2015.  Michel G. Laporte was the president, chief executive officer, and director of ForceField from March 2009 to December 2010, and provides

ongoing consulting services to World Asset Management Inc., which owned 10.3 million shares of ForceField stock as of December 30, 2010, and which owned 7.3% of Methes stock as of September 16, 2013.

27.     Lastly, Plaintiff's investigation revealed that Defendant St-Julien had shared an office with Martin Tremblay, who, according to press release by the U.S. Attorney for the Southern District of New York, was a "Canadian national and President and Managing Director of the Bahamas-based investment firm Dominion Investments, Ltd.," and who was indicted for conspiring with others to launder $1 billion, using "Dominion Investment accounts to receive proceeds of international narcotics trafficking, securities fraud scams, income tax evasion, mail and wire fraud schemes, and bank fraud, among other crimes.... To further conceal the source and nature of these funds, TREMBLAY and his co-conspirators created shell companies and fictitious entities, using false nominees, addresses, and telephone numbers, to launder these illegal proceeds."  Tremblay was sentenced to four years in prison.

28.     Upon information and belief, Defendant St-Julien is a citizen of Canada and Costa Rica.

29.     Defendant David Natan ("Natan") has served as the Chief Executive Officer and a Director of ForceField since December 8, 2010.  Additionally, he replaced Defendant St-Julien as the Company's Chairman of the Board on April 19, 2015.  He previously served as the Company's Chief Financial Officer from February 9, 2010 until his resignation on October 17, 2011.  According to the Form 10-K/A filed with the SEC on April 30, 2015, as of that day, Defendant Natan owned 1.03 million shares of the Company's common stock, which is 5.78% of the Company's issued and outstanding common stock.

30.     The 2014 Proxy Statement stated the following about Defendant Natan:

Mr. Natan is a seasoned financial executive. Formerly a Big Four CPA with Deloitte Touche, he has more than thirty years of experience in areas of accounting, treasury, finance, corporate operations, and executive level management of both public and private companies. Mr. Natan was appointed our Chief Financial Officer and Director in February 2010 and was appointed our Chief Executive Officer in December 2010. Mr. Natan maintained both positions until October 2011 when Jason Williams was appointed our Chief Financial Officer. From November 2007 through January 2010, Mr. Natan was President of Natan & Associates, LLC, a financial consulting firm. Mr. Natan's career has spanned a wide range of industries. He has previously served as CFO/Treasurer of four public companies and as CFO of three private companies. During his tenure as CFO, his public company was ranked as one of Forbes Magazine's "Top 50 Best Small Companies in America" for three consecutive years. He also served as a Director of a public company and as President of a public company subsidiary. Mr. Natan has participated in over fifteen merger and acquisition transactions. He has been instrumental in raising in excess of $500 million of debt and equity capital on favorable terms and from a variety of funding sources. Mr. Natan holds a B.A. in Economics from Boston University, where he was elected to the National Economics Honor Society. He also holds a Certified Public Accountant license (inactive) in the state of Florida.

31.     The *Seeking Alpha* Exposé, however, disclosed the following additional sordid

facts about Defendant Natan's past:

ForceField is run by CEO David Natan. Notably, Mr. Natan does not name any of his past companies on his official bio. We can now see why.

From Bloomberg we can see the detailed history of Mr. Natan and his lengthy history of working with promotional companies based out of Boca Raton. For those who don't know, Boca Raton happens to be the center of stock promotion (and sometimes fraud) in America.

Further digging shows that his past companies are mostly bankrupt former pink sheets companies based out of South Florida, such as MBf, Global Technovations and IMX Pharma.

Just prior to running ForceField/SunSi, Mr. Natan was CFO of a company called SFBC and he was the one responsible for signing off on their financial statements.

SFBC was basically a south Florida recruitment mill for finding subjects (often illegal immigrants) to act as guinea pigs in clinical trials for drugs that had not yet been approved by the FDA. A lengthy and scathing exposé on SFBC can be found on Bloomberg, entitled "Big Pharma's Shameful Secret", and it is well worth reading.

- 11 -

Anyone who has an interest in pharma or clinical trials should absolutely read that article. In the wake of this exposé, SFBC's share price fell by as much as 75%.

According to the fraud complaint filed in the District Court of New Jersey, SFBC told investors that it had a **new state of the art facility** which would drive the majority of revenues going forward. In fact, the building was nothing more than a dilapidated **former Holiday Inn** that

"was so structurally unsound that the Miami Dade County Unsafe Structures Board has since **ordered the facility to be demolished**."

It was fraud, plain and simple.

The fraud case goes on to state that:

"SFBC risked its reputation and recruitment ability by utilizing a variety of **unethical and dangerous practices** that severely compromised the integrity of the drug trials conducted by the Company. For example, as detailed below, SFBC violated applicable minimum waiting requirements, **used deceptive payment schemes to decrease the likelihood that a participant would report adverse reactions** to the drugs being tested, failed to put into place adequate controls to prevent participants from applying to concurrent drug trials at other facilities, and failed to ensure that participants - the majority of whom are **low-income individuals who speak English, if at all, as a second language** - provided the required "informed consent."

"Further, in order to ensure that SFBC's **improper and unethical practices** remained hidden from public view, the Company **hired regulatory companies that were completely beholden to SFBC and its employees**. For example, throughout the Class Period, SFBC paid hundreds of thousands of dollars to a regulatory company called Southern Institutional Review Board ("Southern IRB") - a supposedly independent review board ("IRB") - to oversee and "approve" a substantial portion of their clinical tests. Southern IRB was owned and operated by the wife of a senior officer of SFBC. Similarly, SFBC utilized LeeCoast IRB to supervise its tests, despite the fact that **LeeCoast IRB was owned by an SFBC subsidiary** and employees of LeeCoast were paid directly by SFBC with checks prepared by SFBC's own accounting offices."

**Clearly the goal of all of this was to prop up the stock so that money could be raised. And that plan worked quite well.**

"Defendants' untrue and misleading statements and omissions allowed SFBC to **project the appearance of growth and success, which inflated the price of SFBC's securities** and enabled the Company's insiders to enrich themselves at investors' expense. Indeed, during the Class Period, the individual defendants sold significant portions of their SFBC stock, generating tens of millions of dollars in personal profits. They were also able to

- 12 -

orchestrate two large **secondary offerings of SFBC securities**, which allowed the Company to **raise a total of approximately $250 million from unwitting investors.**"

Insider sales were large. As noted in the Sought Florida Business Journal, "SFBC execs pull in $15.71M from stock sales".  This was just shortly before the fraud came unraveled and occurred before the stock price collapsed.

(Emphasis in original.)

32.     Upon information and belief, Defendant Natan is a citizen of New York.

33.     Defendant Jason Williams ("Williams") has served as the Company's Chief Financial Officer since October 17, 2011.   On April 19, 2015, Defendant Williams was appointed to also be the Company's Executive Vice President and Assistant Secretary. According to the Form 10-K/A filed with the SEC on April 30, 2015, as of that day, Defendant Williams owned 122,500 shares of the Company's common stock, which is 0.69% of the Company's issued and outstanding common stock.   The 2014 Proxy Statement stated the following about Defendant Williams:

Mr. Williams has served as Chief Financial Officer and Corporate Treasurer since October 2011. Mr. Williams has significant financial and operational experience with publicly traded companies. From August 2007 to August 2010, he served as Corporate Controller and Chief Financial Officer at Protective Products of America, Inc. and its successors. From July 2002 to August 2007, he served as Corporate Controller and Director of Reporting & Analysis at PharmaNet Development Group, Inc. From 1995 to 2002, he served in various financial leadership positions with Patagon.com, Inc., vFinance, Inc. and The BISYS Group. Mr. Williams has served as President of WM Consulting, LLC, a business advisory firm, since March 2001. He holds a Bachelor of Science from Florida Atlantic University.

34.     The *Seeking Alpha* Exposé, however, disclosed the following additional sordid facts about Defendant Williams' past:

As for ForceField's CFO, Jason Williams, he notes on his bio that he was previously at Protective Products of America (OTCPK:PPAFQ), which happens to be a pink sheets company that trades for less than 1 penny. Not surprisingly, Protective was based in South Florida. In the 3 years that it traded as a public company, Protective never filed a

single financial statement, so it is unclear what Mr. Williams' actual duties might have been at that company. (At ForceField, financial statements have been delinquent in each of the past 3 years, again raising doubts about his role as CFO).

But it gets better.

Prior to that, Williams notes that at PharmaNet he was an integral part of the management team that facilitated a market capitalization rise from $150 million to $800 million during a three-year period. It does sound impressive.

**However, this bio fails to mention some key facts. Most importantly, PharmaNet is in fact the same SFBC that settled fraud charges two years after the Bloomberg article.**

Yes, in fact, the stock did spike to a valuation of over $800 million during the tenure of Mr. Williams. But that was before it cratered to as low as $50 million (down 85%) in the wake of the Bloomberg fraud exposé.

I would encourage readers to re-read the fraud case against SFBC and its management to fully appreciate its implications.

From the introduction of the fraud case:

"This is a case about a company that **repeatedly misled investors** about the most fundamental aspects of its business and operations. That company is SFBC, and throughout the Class Period, SFBC and its senior officers told investors that SFBC was a well-run business with highly-qualified management and significant competitive advantages in its field. In reality, however, **SFBC suffered from a raft of undisclosed problems that infected its business and threatened the Company's very survival.**"

After the US Senate launched an official investigation into the company, they simply began running their clinical trials in Canada.

You can read about the name change and the move to Canada in this article.

"Troubled SFBC changes its name in hope of changing its fortunes"

(Emphasis in original.)

35.     Upon information and belief, Defendant Williams is a citizen of Florida.

36.     Defendant Kébir Ratnani ("Ratnani") has been a Company Director since 2009.

He is a member of the Audit Committee and is also a member of the Nominating, Compensation

- 14 -

and Corporate Governance Committee.   According to the Form 10-K/A filed with the SEC on

April 30, 2015, as of that day, Defendant Ratnani owned 22,874 shares of the Company's

common stock.  The 2014 Proxy Statement stated the following about Defendant Ratnani:

> Mr. Ratnani possesses an encompassing 30-year experience in the natural gas, electricity, windmill, wastewater and water sectors. Over the course of his career, he has assumed different managerial and technical functions, academically endowed with a Diploma in Management & Marketing from the Institute of Gas Technology in Chicago, U.S.A, an M Sc. A. and a B.Sc. A. in Chemical Engineering from Laval University in Quebec, Canada. His high-caliber profile and track record are distinguished through his professional achievements. Mr. Ratnani's proficiency in his fields of expertise led him to develop 13 inventions for which he now owns patents; all related to natural gas, petrochemical and environmental technologies. At the international level, he concluded numerous cooperation agreements with several governments, namely Algeria, Cameroon, Gabon, Kenya, Tunisia, Senegal, Libya, Gambia, UAE, Egypt, Lebanon, Syria, Saudi Arabia and Kuwait, Japan, Malaysia, Vietnam as well as Denmark, France, Spain, Slovakia, Germany, Hungary and Russia. He also negotiated project financing with organizations such as the World Bank, Asian Development Bank, and CIDA. In 1991, he directed the opening of the Natural Gas Technologies Centre, a research organization associated with Gaz Métropolitain, Gaz de France, Brooklyn Union Gas, and Osaka Gas. Subsequently, in 1997, he was appointed Vice-President of Hydro Quebec International. In this capacity, he was responsible for the Technology, Transfer and BOT (Build, Operate & Transfer) and Concession projects. More recently, in 2000, he joined SNCLavalin International, one of the leading engineering and construction groups in the world and a major player in the ownership of infrastructure and in the provision of operations and maintenance services, as Senior Vice-President. He is responsible for Water, Energy and Infrastructure Projects in Africa, the Middle East and Latin America.

37.    Plaintiff's investigation revealed that Defendant Ratnani's background information

failed to disclose his past work as a director or officer at many companies with dubious pasts at

which other Individual Defendants were managers or shared close affiliations.   Defendant

Ratnani was a director at Terra Nostra from November 2003 to April 2005.  Defendant St-Julien

was the vice president, secretary, and director at Terra Nostra during Defendant Ratnani's tenure

at Terra Nostra from August 2002 to April 2005, and Defendant St-Julien continued at Terra

Nostra thereafter.   Daniel Julien, another director at Terra Nostra, was ForceField's Chief

Accounting Officer and Chief Financial Officer until February 9, 2010.  According to an article entitled "Fund's Chinese Stake Stirs Some Questions," published in the *New York Post* on October 31, 2007, Terra Nostra's management were involved with "some spectacular failures" and have a history of violating securities laws through making false public statements **and trading Terra Nostra stock through nominees without disclosing it**.  Another article, published on *Reuters* on November 26, 2008, and entitled "Noteholders petition for Terra Nostra bankruptcy," stated that Terra Nostra's entire executive team were terminated or resigned and that the company filed for bankruptcy.

38.    Plaintiff's investigation also revealed that Defendant Ratnani is and has been since September 2008 a director of Methes, at which Defendant St-Julien was the vice president and the chief legal officer from June 2007 through September 2009 or later, Daniel Julien was the chief accounting officer from June 2007 through September 2009 or later, and at which Michel G. Laporte is the chairman, chief executive officer, and treasurer, and the owner of 7.1% of Methes common stock as of March 11, 2015.  Michel G. Laporte was the president, chief executive officer, and director of ForceField from March 2009 to December 2010, and provides ongoing consulting services to World Asset Management Inc., which owned 10.3 million shares of ForceField stock as of December 30, 2010, and which owned 7.3% of Methes stock as of September 16, 2013.

39.    Additionally, Plaintiff's investigation revealed that Hydro Quebec International Inc., at which Defendant Ratnani served from 1997 to 2000, also employed Jean LaFleur as vice president.  As set forth above, "Defendant St. Julien was working as a lawyer in **Costa Rica** helping to funnel cash to and from convicted fraudster Jean LaFleur." (Emphasis in original.)

40.     Lastly, Plaintiff's investigation revealed that Defendant Ratnani was reported in articles published in *Le Journal de Montreal* on April 20 and 21, 2015 as no longer having been an executive at SNC-Lavalin since mid-2013, which reveals the falsity of ForceField's 2014 Proxy Statement's statement that Defendant Ratnani was still at SNC-Lavalin at the time it was filed with the SEC.   The articles associated his departure from SNC-Lavalin to his connections with fraudster Defendant St-Julien.   The April 21, 2015 article in *Le Journal de Montreal* also revealed that Defendant Ratnani's work at SNC-Lavalin in connection with the son-in-law, Sakhr el-Materi, of the ousted president of Tunisia, Zine el-Abidine Ben Ali, was the subject of an investigation in Tunisia.   An article published in *La Presse* on April 30, 2012 stated that Defendant Ratnani had power of attorney to take care of a $2.5 million house in Westmount, Canada belonging to Sakhr el-Materi, and that the ousted President of Tunisia was arrested and was accused of looting Tunisia for over twenty years.   According to the article in *La Presse*, Defendant Ratnani was taking orders from Zine el-Abidine Ben Ali, Defendant Ratnani claimed that SNC-Lavalin knew about his taking care of Sakhr el-Materi's luxurious house, SNC-Lavalin denied knowing about even the existence of Sakhr el-Materi's house, and the Tunisian government found that SNC-Lavalin's conduct with Sakhr el-Materi involved bribery. According to an article published in *The Gazette* on September 9, 2014, three others at SNC-Lavalin, who were its executives at the time, including the chief financial officer, financial controller, and vice president, along with six other persons, faced criminal charges arising from a $1.3 billion contract for SNC-Lavalin to build a hospital at McGill University Health Centre ("MUHC") and a bid-rigging scheme to defraud MUHC of $22.5 million.   Another article published in the *Huffington Post* on April 22, 2015 stated that SNC-Lavalin executives were

- 17 -

charged with $47.7 million bribes and defrauded Libya of $129.8 million and faced similar scandals for projects in Bangladesh and Mexico.  Another article stated that the "World Bank suspended SNC-Lavalin in 2013 from bidding on projects it finances for a decade over allegations of bribery involving a bridge contract in Bangladesh and a project in Cambodia." Lastly, SNC-Lavalin's offices in North Africa had very close ties to the former Gadhafi regime and helped members of Gadhafi's family emigrate from Libya when his regime toppled.

41.    Upon information and belief, Defendant Ratnani is a citizen of Canada.

42.    Defendant Adrian Auman ("Auman") has been a Company Director since 2011. He is a member of the Audit Committee and is also a member of the Nominating, Compensation and Corporate Governance Committee.   According to the Form 10-K/A filed with the SEC on April 30, 2015, as of that day, Defendant Auman owned 17,874 shares of the Company's common stock.  The 2014 Proxy Statement stated the following about Defendant Auman:

> Mr. Auman is Corporate Vice President Investor Relations and Special Projects since September 2008 at Orbotech, Ltd., a NASDAQ listed company that manufactures yield-enhancing and production solutions for the supply chain of the electronics industry. Orbotech is a leader in its industry, generating more than $500 million annually in revenue, with offices in the U.S., Europe, the Middle East, and Asia, including multiple offices in China. Prior to this position he served at Orbotech as Vice President of Finance and Investor Relations from May 2006 to September 2008. He is a certified public accountant in Israel and the US.

Upon information and belief, Defendant Auman is a citizen of New York.

43.    Defendant David Vanderhorst ("Vanderhorst") has been a Company Director since 2011.  He is the Chairman of the Audit Committee and is a member of the Nominating, Compensation and Corporate Governance Committee.   The 2014 Proxy Statement stated that Defendant Vanderhorst is an Audit Committee Financial Expert.  According to the Form 10-K/A filed with the SEC on April 30, 2015, as of that day, Defendant Vanderhorst owned 17,874

shares of the Company's common stock.  The 2014 Proxy Statement stated the following about

Defendant Vanderhorst:

> Mr. Vanderhorst has served as Chief Financial Officer of Taitron Components, Inc., and a NASDAQ-listed semiconductor distribution and engineering services company with offices and operations in the U.S., Mexico, and China, since May 2008, ad Secretary since 2002. Prior to this, Mr. Vanderhorst was Taitron's Controller since 1999. Prior thereto, from 1991 to 1998, Mr. Vanderhorst served as Controller and Chief Financial Officer for various companies. From 1987 to 1991, the national accounting firm of Kenneth Leventhal & Company, now a division of Ernst & Young, LLP, employed Mr. Vanderhorst. Mr. Vanderhorst is a Certified Public Accountant, receiving his professional certification in 1991.

Upon information and belief, Defendant Vanderhorst is a citizen of California.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

44.     By reason of their positions as officers, directors and/or fiduciaries of ForceField

and because of their ability to control the business and corporate affairs of ForceField, the

Individual Defendants owed ForceField and its shareholders fiduciary obligations of trust,

loyalty, good faith, and due care, and were and are required to use their utmost ability to control

and manage ForceField in a fair, just, honest, and equitable manner.  The Individual Defendants

were and are required to act in furtherance of the best interests of ForceField and its shareholders

so as to benefit all shareholders equally.

45.     Each director and officer of the Company owes to ForceField and its shareholders

the fiduciary duty to exercise good faith and diligence in the administration of the Company and

in the use and preservation of its property and assets and the highest obligations of fair dealing.

46.     The Individual Defendants, because of their positions of control and authority as

directors and/or officers of ForceField, were able to and did, directly and/or indirectly, exercise

control over the wrongful acts complained of herein.

47.     To discharge their duties, the officers and directors of ForceField were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

48.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of ForceField, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the ForceField's Board at all relevant times.

49.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Securities Exchange Act of 1934 ("Exchange Act") and traded on the NASDAQ, the Individual Defendants had a duty not to effect and to prevent the corrupt stock promoters from effecting the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including false and misleading information

about the Company's managements history, so that the market price of the Company's common stock would be based upon truthful and accurate information.

50.     To discharge their duties, the officers and directors of ForceField were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.   By virtue of such duties, the officers and directors of ForceField were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Nevada, the United States, and pursuant to the ForceField's own Code of Business Conduct and Ethics and internal guidelines;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how ForceField conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of ForceField and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that ForceField's operations would comply with

all laws and ForceField's financial statements filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above; and

(i)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock.

51.     Each of the Individual Defendants further owed to ForceField and the shareholders the duty of loyalty requiring that each favor ForceField's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

52.     At all times relevant hereto, the Individual Defendants were the agents of each other and of ForceField and were at all times acting within the course and scope of such agency.

53.     Because of their advisory, executive, managerial, and directorial positions with ForceField, each of the Individual Defendants had access to adverse, non-public information about the Company.

54.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by ForceField.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

55.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

56.     The purpose and effect of the conspiracy, common enterprise and/or common course of conduct was, among other things, to: (i) to engage in, facilitate, and conceal the scheme to manipulate the price and trading volume of ForceField's stock by using undisclosed nominee accounts to purchase and sell the stock and through the use of stock promoters and broker dealers who failed to disclose to potential investors that they had been paid by the Individual Defendants to promote the purchase of the stock and whose reports were reviewed by ForceField's management before publication; (ii) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; (iii) to conceal adverse information concerning the Company's officers and failure to maintain adequate internal and financial controls; and (iv) to fail to maintain adequate internal and financial controls.

57.    The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by, among other things, causing the Company to purposefully, recklessly or negligently fail to maintain effective accounting and internal control policies and procedures.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

58.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

59.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of ForceField, and was at all times acting within the course and scope of such agency.

## **CODE OF ETHICS**

60.    Pursuant to the Company's Code of Business Conduct and Ethics (the "Code of Ethics"), the conduct of all of the Company's officers, directors, and employees is governed by the Code of Ethics.

61.    The Code of Ethics provides, as to "Identifying Potential Conflicts of Interest," that:

A conflict of interest can occur when an employee's private interest interferes, or appears to interfere, with the interests of the Company as a whole. You should

- 24 -

avoid any private interest that influences your ability to act in the interests of the Company or that makes it difficult to perform your work objectively and effectively.

Identifying potential conflicts of interest may not always be clear-cut. The following situations are examples of conflicts of interest:

• Outside Employment. No employee should be employed by, serve as a director of, or provide any services to a company that is a material customer, supplier or competitor of the Company.

• Improper Personal Benefits. No employee should obtain any material (as to him or her) personal benefits or favors because of his or her position with the Company.

• Financial Interests. No employee should have a significant financial interest (ownership or otherwise) in any company that is a material customer, supplier or competitor of the Company. A "significant financial interest" means ownership of greater than 1% of the equity of a material customer, supplier or competitor.

• Loans or Other Financial Transactions. No employee should obtain loans or guarantees of personal obligations from, or enter into any other personal financial transaction with, any company that is a material customer, supplier or competitor of the Company. This guideline does not prohibit arms-length transactions with banks, brokerage firms or other financial institutions.

• Service on Boards and Committees. No employee should serve on a board of directors or trustees or on a committee of any entity (whether profit or not-for-profit) whose interests reasonably would be expected to conflict with those of the Company.

• Actions of Family Members. The actions of family members outside the workplace may also give rise to the conflicts of interest described above because they may influence an employee's objectivity in making decisions on behalf of the Company. For purposes of this Code, "family members" include your spouse or life-partner, brothers, sisters and parents, in-laws and children whether such relationships are by blood or adoption.

If you are uncertain whether a particular company is a material customer, supplier or competitor, please contact the Chief Financial Officer for assistance.

62.     The Code of Ethics provides, as to "Disclosures of Conflicts of Interest," that:

The Company requires that employees disclose any situations that reasonably

- 25 -

would be expected to give rise to a conflict of interest. If you suspect that you have a conflict of interest, or something that others could reasonably perceive as a conflict of interest, you must report it to your supervisor or the Chief Financial Officer. Your supervisor and the Chief Financial Officer will work with you to determine whether you have a conflict of interest and, if so, how best to address it. Although conflicts of interest are not automatically prohibited, they are not desirable and may only be waived as described in "Waivers of the Code" above.

63.     The Code of Ethics provides, as to "Company Records," that:

Accurate and reliable records are crucial to our business. Our records are the basis of our earnings statements, financial reports and other disclosures to the public and guide our business decision-making and strategic planning. Company records include booking information, payroll, timecards, travel and expense reports, e-mails, accounting and financial data, measurement and performance records, electronic data files and all other records maintained in the ordinary course of our business.

All Company records must be complete, accurate and reliable in all material respects. Undisclosed or unrecorded funds, payments or receipts are inconsistent with our business practices and are prohibited. You are responsible for understanding and complying with our record keeping policy. Ask your supervisor if you have any questions.

64.     The Code of Ethics provides, as to "Accuracy of Financial Reports and Other Public Communications," that:

As a public company we are subject to various securities laws, regulations and reporting obligations. Both federal law and our policies require the disclosure of accurate and complete information regarding the Company's business, financial condition and results of operations. Inaccurate, incomplete or untimely reporting will not be tolerated and can severely damage the Company and result in legal liability.

The Company's principal financial officers and other employees working in the Accounting Department have a special responsibility to ensure that all of our financial disclosures are full, fair, accurate, timely and understandable. These employees must understand and strictly comply with generally accepted accounting principles and all standards, laws and regulations for accounting and financial reporting of transactions, estimates and forecasts.

- 26 -

65.     The Code of Ethics provides, as to "Compliance with Laws and Regulations," that:

> Each employee has an obligation to comply with all laws, rules and regulations applicable to the Company operates. These include, without limitation, laws covering bribery and kickbacks, copyrights, trademarks and trade secrets, information privacy, insider trading, illegal political contributions, antitrust prohibitions, foreign corrupt practices, offering or receiving gratuities, environmental hazards, employment discrimination or harassment, occupational health and safety, false or misleading financial information or misuse of corporate assets. You are expected to understand and comply with all laws, rules and regulations that apply to your job position. If any doubt exists about whether a course of action is lawful, you should seek advice from your supervisor or the Chief Financial Officer.

66.     The Code of Ethics provides, as to "Reporting Violations of the Code," that:

> All employees have a duty to report any known or suspected violation of this Code, including any violation of the laws, rules, regulations or policies that apply to the Company. If you know of or suspect a violation of this Code, immediately report the conduct to your supervisor. Your supervisor will contact the Chief Financial Officer, which will work with you and your supervisor to investigate your concern. If you do not feel comfortable reporting the conduct to your supervisor or you do not get a satisfactory response, you may contact the Chief Financial Officer or any other executive officer directly. All reports of known or suspected violations of the law or this Code will be handled sensitively and with discretion. Your supervisor, the Chief Financial Officer and the Company will protect your confidentiality to the extent possible, consistent with law and the Company's need to investigate your concern.

> It is Company policy that any employee who violates this Code will be subject to appropriate discipline, which may include termination of employment. This determination will be based upon the facts and circumstances of each particular situation. An employee accused of violating this Code will be given an opportunity to present his or her version of the events at issue prior to any determination of appropriate discipline. Employees who violate the law or this Code may expose themselves to substantial civil damages, criminal fines and prison terms. The Company may also face substantial fines and penalties and many incur damage to its reputation and standing in the community. Your conduct as a representative of the Company, if it does not comply with the law or with this Code, can result in serious consequences for both you and the Company.

67.     In violation of the Code of Ethics, the Individual Defendants (as key officers and as members of the Company's Board) conducted little, if any, oversight of the Company's internal controls over public reporting of the Individual Defendants' scheme to manipulate the price and trading volume of ForceField's stock by using undisclosed nominee accounts to purchase and sell the stock and through the use of stock promoters and broker dealers who failed to disclose to potential investors that they had been paid by the Individual Defendants to promote the purchase of the stock and whose reports were reviewed by ForceField's management before publication, scheme to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment, and scheme to conceal adverse information concerning the Company's officers and failure to maintain adequate internal and financial controls.   In violation of the Code of Ethics, the Individual Defendants consciously disregarded their duties to comply with the applicable laws and regulations, protect corporate assets, engage in fair dealing, avoid using corporate opportunities for personal gain, avoid conflicts of interest, appropriately maintain the Company's books, records, accounts, and financial statements, and make accurate filings with the SEC.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

68.     On September 16, 2013 when the Company issued a press release entitled "ForceField Energy Announces Engagement of MissionIR Investor Relations Services."   The press release stated in relevant part:

> ATLANTA, GA (Marketwire Sep 16, 2013) ForceField Energy Inc. (OTCQB: FNRG) (the "Company") today announces that they have engaged the investor relations services of MissionIR. Through a network of investor oriented sites and full suite of investor awareness services, MissionIR broadens the influence of publicly traded companies and enhances their ability to attract growth capital as well as improve shareholder value.

"ForceField Energy has an exciting business model targeting two of the largest and fastest growing areas of the global renewable energy space," stated Sherri Franklin, Director of Marketing at MissionIR. "The Company is well positioned in both sectors and has an experienced management team in place to fully execute its growth strategy."

David Natan, CEO of ForceField Energy, stated, "Engagement of a full service investor relations firm to develop and implement a strategic investor relations campaign is a key part of our overall strategy to achieve short term and long term goals. MissionIR is providing a much needed service in the small cap markets."

69.     On or about October 13, 2013, ForceField filed a Form 8-K with the SEC stating that its common stock had been approved for listing on the NASDAQ Capital Market, the NASDAQ equity market for small-cap companies.

70.     On or about December 23, 2013, Defendant St-Julien rang the closing bell at the NASDAQ MarketSite.

71.     Aristotelis Kougemitros, a Special Agent with the Federal Bureau of Investigation, (the "FBI Special Agent"), through his investigation, which included his review of telephone records, bank records, and trading records, from approximately August 2012 to April 2015, found that Defendant St-Julien funded the purchase of stock of ForceField (the name of which was SunSi Energies, Inc. until February 28, 2013) by a dermatologist in Boulder, Colorado who was not registered as a broker and had not worked in the securities industry (the "Dermatologist"), and directed the Dermatologist to buy and sell the ForceField stock from the Dermatologist's brokerage account at Scottrade, Inc. ("Scottrade").

72.     Defendant St-Julien's funding of the Dermatologist's repeated and significant purchases of ForceField shares and the control he exercised over the Dermatologist's trading activity in ForceField were not disclosed to the investing public.

73.     Defendant St-Julien's funding of the Dermatologist's repeated and significant purchases of ForceField shares was evidence that the Individual Defendants used nominees to

purchase and sell ForceField stock on their behalf without disclosure to investors and potential investors, in violation of securities laws, in order to create the appearance of genuine trading volume and interest in ForceField stock.

74.     On or about August 20, 2012, approximately $20,000 was transferred from ForceField's bank account at HSBC, on which Defendant St-Julien was one of the signatories, to a bank account at an offshore, untaxed bank, Belize Bank International ("BBI"), for which Defendant St-Julien was a signatory.  The BBI bank account belongs to Adventure Overseas Holding Corp. ("Adventure Overseas"), which Defendant St-Julien controlled.

75.     On or about August 21, 2012, approximately $100,000 was transferred from BBI bank account to the Dermatologist's bank account at Wells Fargo. Later that day, the Dermatologist wired $20,000 from his Wells Fargo bank account to his Scottrade brokerage account, which had a balance at the time of approximately $132.

76.     On or about August 23, 2012, the Dermatologist began purchasing ForceField stock from his Scottrade brokerage account.  The FBI Special Agent's review of trading records revealed that for the remainder of 2012 and 2013, the Dermatologist periodically bought and sold ForceField stock in an apparent effort to create trading volume in ForceField with funds provided to him by Defendant St-Julien.

77.     Throughout 2014, Defendant St-Julien provided additional funding to the Dermatologist, which the Dermatologist then transferred into his Scottrade brokerage account to purchase ForceField stock.  Defendant St-Julien was frequently in contact by telephone with the Dermatologist within minutes of the Dermatologist's purchases and sales of ForceField stock, further evidencing Defendant St-Julien's control over the Dermatologist's trading activity.

78.     On or about March 3, 2014, Defendant St-Julien texted the Dermatologist at approximately 10:29 a.m.   From approximately 10:29 a.m. to 10:34 a.m., the Dermatologist placed six orders to purchase a total of 4,000 shares of ForceField stock.   Telephone records show that at approximately 10:35 a.m., the Dermatologist texted Defendant St-Julien.   The Dermatologist's purchase orders of ForceField stock accounted for almost 25 percent of the trading volume that day.

79.     On or about March 11, 2014, at approximately 9:32 a.m., the Dermatologist placed an order to purchase ForceField stock.   At approximately 9:33 a.m. and 9:34 a.m., the Dermatologist and Defendant St-Julien exchanged text messages.   At approximately 9:35 a.m., the Dermatologist placed another order to purchase ForceField stock.   In total, the Dermatologist's purchase orders of ForceField stock accounted for approximately 21 percent of the trading volume that day.

80.     On or about March 19, 2014, from approximately 1:46 p.m. to 2:42 p.m., the Dermatologist placed six orders to buy or sell ForceField stock.   At approximately 2:51 p.m., the Dermatologist texted Defendant St-Julien.   From approximately 3:03 p.m. to 3:57 p.m., the Dermatologist placed three additional orders regarding ForceField stock.   At approximately 4:00 p.m., the Dermatologist texted Defendant St-Julien.   From approximately March 3, 2014 to March 19, 2014, the price of ForceField stock began at $5.00 per share, dropped to $4.55 per share, and ultimately increased to $6.18 per share, aided in part by Defendant St-Julien's and the Dermatologist's manipulative and undisclosed trading.

81.     On or about June 3, 2014, $25,000 was wired from Adventure Overseas' BBI bank account to the Dermatologist's Wells Fargo bank account.   On that day, at approximately

9:35 a.m., the Dermatologist received a text message from Defendant St-Julien.   Between approximately 9:51 a.m. and 10:05 a.m. that day, the Dermatologist placed four purchase orders of ForceField stock.  At approximately 10:06 a.m., the Dermatologist texted Defendant St-Julien. Later that day, the Dermatologist placed four additional trade orders regarding ForceField stock and had five additional text exchanges with Defendant St-Julien.

82.     On or about June 6, 2014, the Dermatologist wired approximately $25,000 from his Wells Fargo bank account to his Scottrade brokerage account, which had a balance of approximately $37,000 at that time.   Between approximately 2:34 p.m. and 3:49 p.m., the Dermatologist and Defendant St-Julien exchanged approximately eight text messages.   At approximately 3:49 p.m., the Dermatologist placed two purchase orders of ForceField stock. From approximately 3:51 p.m. to 3:58 p.m., the Dermatologist and Defendant St-Julien exchanged approximately four text messages.   At approximately 3:58 p.m. and 3:59 p.m., the Dermatologist placed two more purchase orders for ForceField stock.   Between approximately 3:59 p.m. and 11:15 p.m., the Dermatologist and Defendant St-Julien exchanged approximately eleven text messages.

83.     On or about June 13, 2014, approximately $25,000 was wired from ForceField's HSBC bank account, on which Defendant St-Julien was one of the signatories, to Adventure Overseas' BBI bank account.  On or about June 16, 2014, approximately $25,000 was wired from Adventure Overseas' BBI bank account to the Dermatologist 's Wells Fargo bank account.  On or about June 17, 2014, the Dermatologist wired approximately $25,000 from his Wells Fargo bank account to his Scottrade brokerage account, which had a balance of approximately $47,000 at that time.  On that day, at approximately 9:56 a.m. and 10:12 a.m., Defendant St-Julien and the

Dermatologist exchanged two text messages.  At approximately 10:12 a.m., the Dermatologist placed an order to purchase ForceField stock.  The Dermatologist placed two more purchase orders of ForceField stock between approximately 12:23 p.m. and 12:24 p.m., and then exchanged approximately six text messages from approximately 12:25 p.m. to 8:46 p.m. with Defendant St-Julien.

84.     On or about June 27, 2014, the Dermatologist wired approximately $25,000 from his Wells Fargo bank account to his Scottrade brokerage account, which had a balance of approximately $42,000 at that time.  Later that day, the Dermatologist placed one purchase order of ForceField stock at approximately 3:59 p.m.  At approximately 4:11 p.m., the Dermatologist exchanged two text messages with Defendant St-Julien.   On or about June 30, 2014, approximately $24,975 was wired from Defendant St-Julien's Bank of America San Jose bank account to the Dermatologist's Wells Fargo bank account.

85.     On or about September 26, 2014, approximately $15,000 was transferred from Adventures Overseas' BBI bank account to the Dermatologist's Wells Fargo bank account.  The wire detail for this transaction was "Advance on Purchase of Shares."  On or about September 29, 2014, the Dermatologist transferred approximately $15,000 to his Scottrade brokerage account.  Trading and telephone records show that Defendant St-Julien continued to direct the Dermatologist's trading of ForceField stock.

86.     Under the direction and control of the Individual Defendants, corrupt stock promoter firms touted ForceField stock.

87.     The FBI Special Agent found that wire transfer records reveal that, on or about January 27, 2015, the Dermatologist wired approximately $50,000 to a corrupt stock promoter.

On or about January 30, 2015, that corrupt stock promoter, through his stock promotion company, began promoting the purchase of ForceField stock on the promotion company's publicly available Facebook page.  Notably, the disclaimer on that Facebook page falsely stated, in sum and substance, that that corrupt stock promoter was being compensated approximately $25,000 to promote ForceField's stock by a corporate entity that is not associated with the Dermatologist, whereas the corrupt stock promoter was actually being compensated $50,000.

88.     DreamTeamGroup ("DTG") and its affiliate Mission Investor Relations ("MissionIR") were among some of the corrupt stock promoter firms that touted ForceField stock without disclosing that they were paid to do so.

89.     The purpose of this promotional campaign was to raise additional capital, increase shareholder value, and raise visibility to the public capital market.

90.     DTG and MissionIR conducted a massive promotional campaign, which included publishing articles or news reports and making various statements through various social media outlets and websites, including *SeekingAlpha.com*.

91.     The articles did not disclose that they were authored by paid promoters under the control of ForceField nor did they disclose the authors had a business relationship with ForceField.

92.     On April 15, 2015, the *Seeking Alpha* Exposé, entitled "ForceField Energy: Undisclosed Promotions And Management Connections to Past Fraud" was published.  The *Seeking Alpha* Exposé explained about DTG's and MissionIR's illegal promotion of ForceField as follows:

> In the past, ForceField was a Dream Team client. The Dream Team was a firm that got paid to write undisclosed paid articles, which were edited and approved by management teams of their clients. The retail targeted articles were designed to prop up the share price and volume so that companies could issue stock to raise money. The scam worked

exceptionally well.

\*        \*        \*

Back in 2014, I wrote a detailed article about stock promotion firm "The Dream Team Group" which was hiring out writers to conduct undisclosed paid promotions on small cap companies. The writers would pretend to be well qualified industry experts putting forth a professional analysis (and a strong buy) on a stock. In fact, they were simply hired gun writers with no credentials whatsoever. Yet their professional writings invariably caused their target stocks to soar. The authors managed to infiltrate a wide variety of locations, including Forbes.com, TheStreet.com, Seeking Alpha and the Wall Street Cheat Sheet.

To gain information, I posed as a paid stock promoter looking to write undisclosed paid articles. The chief writer for the Dream Team (Tom Meyer) then began giving me assignments.

The main stocks I wrote about in this promotion scandal were Galena Biopharma (NASDAQ:GALE) and CytRx (NASDAQ:CYTR), both of which ended up plunging by as much as 50-80% when the promotions unraveled. CytRx has rebounded some, while Galena has continued to plunge.

But there were other companies which I did not give as much attention to because they were too small or illiquid to matter at the time. (Although I did not write about many of these stocks, I did notify all of the various websites such as Seeking Alpha, TheStreet.com and Wall Street Cheat Sheet so that they could remove any articles and ban any violating authors).

ForceField Energy is one such stock. At the time, it was one of a number of beaten down illiquid stocks which didn't seem to be catching the promotional wave. But now it appears that the continued promotional efforts have resulted in the stock hitting all-time highs on much greater volume. This is all occurring just as the company needs to raise money.

ForceField was a paid Dream Team promotion which was written about by both Tom Meyer (multiple aliases including Wonderful Wizard and others) and John Mylant. These were the two main Dream Team writers. Their articles have since been removed from Seeking Alpha, but the original references can still be found in various places. In addition, ForceField is listed here among the other Dream Team clients on the Investors Hub page for Mission IR. Mission IR was the Dream Team subsidiary responsible for handling the paid articles.

**Mr. Meyer was also attempting to recruit me as a paid writer specifically for ForceField. ForceField was an ongoing project of his.**

**It should be kept in mind that the standard process for these writers was to submit**

- 35 -

**their drafts to management at the target company for review before publishing. In other words, management of these companies knew and encouraged the illegal stock promotion as a way of getting their share prices up.**

(Emphasis in original).

93.     Articles by DTG's primary paid authors Tom Meyer and John Mylant caused a steep run-up in the Company's stock price as did the articles created by MissionIR. Not only did they publish articles under their names, but they used pseudonyms.  For example, Tom Meyer wrote under the name Wonderful Wizard.

94.     What follows are two examples of the many articles touting ForceField by Tom Meyer and John Mylant that failed to disclose that Tom Meyer and John Mylant were paid to write them.

95.     On October 28, 2013, Tom Meyer, using the moniker Wonderful Wizard, published the article entitled "3 Reasons To Buy ForceField Energy" on *SeekingAlpha.com*.  The article touted the Company and gave investors several reasons why it was a good choice to invest in the Company.  This article failed to disclose that it was a paid promotion.

96.     On November 27, 2013, John Mylant of the DTG published the article entitled "ForceField Energy Is One Company Worth Watching In The LED Industry" on *SeekingAlpha.com*.  This article also touted ForceField as a good investment.  In the same way, the article failed to disclose that it was a paid promotion.

97.     On March 20, 2014, *Fortune.com* published the article, "At financial news sites, stock promoters make inroads."  The article discussed the role of stock promoters, specifically the DTG, and how stock promoter's must reveal compensation for these types of articles. The article stated in relevant part:

For example, Seeking Alpha has an article by Mylant, touting ForceField Energy

(FNRG -1.82% ). ***Mylant's disclosure in the article says he did not receive any compensation to write the piece. Yet ForceField is listed as a client on DreamTeam's website. Seeking Alpha, which is in the process of reviewing and removing other articles, says it has evidence that Mylant was paid by some of his subjects to write articles about them***. Mylant could not be reached for comment.  ForceField Energy did not return a call for comment.

(Emphasis added).

98.    The *Seeking Alpha* Exposé also revealed that Tom Meyer wrote articles for Goldman Small Cap Research ("Goldman"), too.

99.    Goldman published 20 different notes and reports on ForceField, according to the *Seeking Alpha* Exposé.

100.    Plaintiff's investigation revealed that at least 10 of those 20 Goldman articles touting ForceField falsely denied that Goldman was paid to write them.   Those 10 articles were published on April 30, 2013, October 17, 2013, October 27, 2013, November 3, 2013, December 15, 2013, March 2, 2014, March 8, 2014, September 14, 2014, April 8, 2015, and April 12, 2015.

101.    Indeed, the *Seeking Alpha* Exposé explained as follows:

Tom Meyer from the Dream Team was moonlighting for Goldman Small Cap Research in addition to working for the Dream Team. Tom informed me that the primary advantage of writing articles for Goldman Small Cap Research was that he gets paid with money orders made out to "cash" such that he could **avoid paying taxes or being traced.**

Tom had assigned me to write an article for Goldman Small Cap on LiveDeal (NASDAQ:LIVE), which I sent to him for his review and for company approval. Tom had been writing his articles for LiveDeal using a female alias by the name of Christine Andrews at places such as TheStreet.com and Wall Street Cheat Sheet. (Those sites were informed and those articles have since been removed)

After I submitted my article, Tom responded with edits and a new title. This is a copy of the edits provided to me by Rob Goldman for an undisclosed paid article on LiveDeal which was requested to appear on either TheStreet.com or Seeking Alpha. Goldman Small Cap continues to engage in paid promotions for Live Deal, as shown. (Note: I never accepted payments for any articles and I saw to it that none of the draft articles would ever be published).

The point of all of this is simply that Goldman Small Cap is a pay to play research firm used for hyping microcap stocks.

102.   The Seeking Alpha Exposé revealed that other stock promoters were also touting ForceField.

103.   According to the Seeking Alpha Exposé, Ultimate Stock Alerts has been "associating the name of ForceField with larger much more liquid stocks in various press releases posing as news articles ..."

104.   Small Cap Street, which has been promoting ForceField, has been paid to promote other companies whose stock has been halted for fraud and/or plunged, and has done promotional work together with Goldman.

105.   The *Seeking Alpha* Exposé and Plaintiff's investigation also revealed facts about the past conduct of Defendants Natan, St-Julien, Williams, and Ratnani in which they were involved with companies with fraudulent and dubious histories, as set forth in paragraphs 24-40 herein.

106.   The Individual Defendants caused the Company to fail to disclose such sordid history as part of the background information on Defendants St-Julien, Natan, Williams, and Ratnani in the Company's Form DEF 14C filed with the SEC on April 30, 2013, Form DEF 14A filed with the SEC on April 30, 2014, and Form 10-K/A filed with the SEC on April 30, 2015.

107.   Those background sections of the Form DEF 14C filed with the SEC on April 30, 2013 and Form DEF 14A filed with the SEC on April 30, 2014 were incorporated by reference in the Company's Form 10-Ks filed with the SEC on April 16, 2013 and April 15, 2014, respectively.

108.   The Individual Defendants caused the Company to fail to maintain adequate disclosure controls and procedures and internal control over financial reporting, which facilitated all of the fraudulent conduct engaged in by the Individual Defendants and all of the fraudulent public disclosures that were made by the Individual Defendants, that they caused the Company to make, and that they caused or facilitated the corrupt stock promoters to make.

109.   The Individual Defendants caused the Company to make false and misleading statements of material fact in their filings with the SEC that the Company's disclosure controls and procedures and internal control over financial reporting were effective, including in the Company's Form 10-Ks filed with the SEC on April 16, 2013, April 15, 2014, and April 15, 2015, and in the Company's Form 10-Qs filed with the SEC on August 20, 2012, November 14, 2012, May 17, 2013, August 16, 2013, November 14, 2013, May 20, 2014, August 19, 2014, and November 19, 2014.

110.   Each of the Company's Form 10-Ks filed with the SEC on April 16, 2013, April 15, 2014, and April 15, 2015 were signed by all of the Individual Defendants, and were accompanied by certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Natan and Williams attesting to their accuracy.

111.   Each of the Company's Form 10-Qs filed with the SEC on August 20, 2012, November 14, 2012, May 17, 2013, August 16, 2013, November 14, 2013, May 20, 2014, August 19, 2014, and November 19, 2014 were signed by Defendants Natan and Williams, and were accompanied by certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the

Exchange Act and the SOX signed by Defendants Natan and Williams attesting to their accuracy.

112.    The Company's Form 10-K/A filed with the SEC on April 30, 2015 was signed by all of the Individual Defendants except for Defendant St-Julien, and was accompanied by certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the SOX signed by Defendants Natan and Williams attesting to their accuracy.

113.    On April 20, 2015 the U.S. Attorney's Office for the Eastern District of New York issued a press release revealing more details about the Company's stock promotion fraud and the criminal activities of Defendant St-Julien, stating that Defendant St. Julien "was arrested late Friday evening on charges of securities fraud conspiracy.  The arrest occurred as St. Julien was preparing to board a plane in Ft. Lauderdale bound for Costa Rica."

114.    The U.S. Attorney's Office press release stated that, according to its complaint filed in the United States District Court for the Eastern District of New York, "since approximately August 2012, St. Julien and his co-conspirators engaged in a scheme to manipulate the price and trading volume of ForceField's stock by using undisclosed nominee accounts, including an account held by a dermatologist in Boulder, Colorado, to purchase and sell the stock, and through the use of stock promoters and broker dealers who failed to disclose to potential investors that they had been paid by St. Julien to promote the purchase of the stock."

115.    The U.S. Attorney's Office press release stated that "St. Julien did not disclose his ownership and control of the shares purchased through nominees and used offshore banks, including in Belize, to pay the nominees to conceal his ownership and control. St. Julien coordinated the purchases by telephone and text messages."

116.    The U.S. Attorney's Office press release explained that "St. Julien and his co-conspirators deceived the investing public by creating the appearance of genuine trading volume and interest in ForceField's stock, and as a result, from approximately January 2014 to April 2015, the price of the stock rose from a low of $4.55 per share to a high of $7.82 per share."

117.    On April 19, 2015 Defendant St-Julien resigned as the Executive Chairman of the Board and all other positions at the Company.  On the same date Defendant David Natan, the Company's Chief Executive Officer, was appointed to also serve as the Company's Chairman of the Board and Corporate Secretary.

118.    On April 20, 2015, NASDAQ Capital Market halted trading in the Company's stock.

119.    On April 21, 2015, the SEC issued an Order of Suspension of Trading of the Company's stock.

## DAMAGES TO FORCEFIELD

120.    As a direct and proximate result of the Individual Defendants' conduct, ForceField has lost and has expended and will continue to expend many millions of dollars.

121.    Such expenditures include, but are not limited to, legal fees associated with the multiple federal securities fraud class action lawsuits filed against the Company and its management, the SEC investigation and subpoena, the criminal charges against and arrest of the Company's Executive Chairman at the time, to NASDAQ's halting of trading of Company stock, to the SEC's suspension of trading of Company stock, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

122.     Such losses include those due to the unjust enrichment of the Individual Defendants and Company employees who were improperly over-compensated by the Company, including through bonuses connected to the Individual Defendants' false and misleading statements that were made intentionally.

123.     As a direct and proximate result of the Individual Defendants' conduct, ForceField has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## DERIVATIVE ALLEGATIONS

124.     Plaintiff brings this action derivatively and for the benefit of ForceField to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of ForceField and unjust enrichment, as well as the aiding and abetting thereof.

125.     ForceField is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

126.     Plaintiff is, and at all relevant times has been, a ForceField shareholder.  Plaintiff will adequately and fairly represent the interests of ForceField in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

127.     Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

- 42 -

128.    A pre-suit demand on the Board of ForceField is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following Individual Defendants: Natan, Ratnani, Auman, and Vanderhorst (collectively, the "Current Directors").  Plaintiff needs only to allege demand futility as to two of the four Current Directors that are on the Board at the time this action is commenced.

129.    Demand is excused as to all of the Current Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of their scheme and false and misleading statements and omissions of material fact, which render them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

130.    In complete abdication of their fiduciary duties, the Current Directors either participated in or were recklessly unaware of the fraudulent scheme to inflate the Company's stock price by engaging in a scheme to manipulate the price and trading volume of ForceField's stock by using undisclosed nominee accounts to purchase and sell the stock and by using stock promoters and broker dealers who failed to disclose to potential investors that they had been paid by the Individual Defendants to promote the purchase of the stock and whose reports were reviewed by ForceField's management before publication; B) by failing to maintain for the Company adequate internal and financial controls; and C) by making and/or causing the Company to make false and misleading statements by failing to disclose to the investing public 1) the above scheme, 2) that members of ForceField's management have troubling histories with fraudulent companies, and 3) that the Company lacked adequate internal and financial controls. All of the Current Directors signed SEC filings containing false and misleading statements and

omissions of material fact, as set forth above.  At a bare minimum, the Current Directors had to have known that the SEC filings that they signed failed to disclose material facts about the troubling histories of Defendants St-Julien, Natan, Williams, and Ratnani, as such information is immediately found by anyone who conducts searches of their names on the Internet.  The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors.  As a result of the foregoing, the Current Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

131.   Additional reasons that demand on Defendant Natan is futile follow.  Defendant Natan, as the Company's Chairman and Chief Executive Officer is thus a non-independent director.  He was ultimately responsible for the Company's operations, internal controls, and all of the false and misleading statements and omissions that were made, including those contained in the SEC filings, all of which he signed.  Further, Defendant Natan deliberately failed to disclose facts about his past sordid conduct in SEC filings.  Moreover, Defendant Natan is a defendant in the securities fraud class action lawsuits.  Thus, for these reasons, too, Defendant Natan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

132.   Defendant Ratnani deliberately failed to disclose in SEC filings, which he signed, facts about his very own past sordid conduct and his having served at different companies at which other Individual Defendants, ForceField managers, and ForceField majority shareholders also served or with which they were affiliated.  Thus, for this reason, too, Defendant Natan

breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

133.    Furthermore, demand in this case is excused because the Current Directors, who are named as defendants in this action, control the Company and are beholden to each other.  The Board is especially beholden to Defendants St-Julien and Natan, who have not only been top managers of ForceField, but are also majority shareholders.  Defendant Ratnani is especially beholden to them as he has served as a director at publicly traded companies with histories of misconduct at which Defendant St-Julien and other ForceField managers and majority shareholders served, and as Defendant Ratnani was vice-president at a company at which a convicted felon was also vice president and received unethical legal representation by Defendant St-Julien.

134.    The Current Directors, as members of the Board, were and are subject to the Code of Ethics.  The Code of Ethics goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations.  The Code of Ethics required the Current Directors to also adhere to ForceField's standards of business conduct.  The Code of Ethics requires all employees, officers and directors to avoid activities or relationships that conflict with our interests or adversely affect the Company's reputation.  The Current Directors did not comply with the requirements of the Code of Ethics.  The Current Directors violated the Code of Ethics because they participated in or were recklessly unaware of the fraudulent scheme to inflate the Company's stock price.  Because the Current Directors violated the Code of Ethics, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

135.    The Current Directors also breached their fiduciary duty of loyalty by failing to ensure that the Company had an adequate system of internal controls in place to prevent the misrepresentations made by the Individual Defendants and the corrupt stock promoters and to prevent the scheme to artificially inflate the Company stock price.  Indeed, the Current Directors knowingly or recklessly disregarded any such controls by causing and facilitating the scheme. Accordingly, the Current Directors breached their fiduciary duties in failing to implement such internal controls and, therefore, face a substantial likelihood of liability, and demand upon them is futile.

136.    The Current Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders.  These conflicts of interest precluded the Current Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct.  Thus, any demand on the Current Directors would be futile.

137.    ForceField has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Current Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for ForceField any part of the damages ForceField suffered and will continue to suffer thereby.  Thus, any demand on the Current Directors would be futile.

138.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgments as it was based on bad faith and intentional, reckless, or disloyal misconduct.  Thus, none of the Current Directors can claim

exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists).  As a majority of the Current Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

139.    The acts complained of herein constitute violations of fiduciary duties owed by ForceField's officers and directors, and these acts are incapable of ratification.

140.    The Current Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of ForceField.  If there is a directors' and officers' liability insurance policy covering the Current Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Current Directors, known as, *inter alia*, the "insured-versus-insured exclusion."  As a result, if the Current Directors were to sue themselves or certain of the officers of ForceField, there would be no directors' and officers' insurance protection.  Accordingly, the Current Directors cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery.  Thus, demand on the Current Directors is futile and, therefore, excused.

141.    If there is no directors' and officers' liability insurance, then the Current Directors will not cause ForceField to sue the Individual Defendants named herein, since, if they did, they

would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

142.    Thus, for all of the reasons set forth above, all of the Current Directors, and, if not all of them, certainly at least two of the Current Directors, cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against the Individual Defendants for Breach of Fiduciary Duties**

143.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

144.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of ForceField's business and affairs.

145.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

146.    The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of ForceField.

147.    In breach of their fiduciary duties owed to ForceField, the Individual Defendants willfully participated in misrepresentation of the Company's business operations and prospects, failed to correct the Company's public statements and corrupt stock promoters' public statements

about the Company, and failed to properly oversee ForceField's business and internal controls, rendering them personally liable to the Company for breaching their fiduciary duties.

148.    The Individual Defendants had actual or constructive knowledge that that they had caused the Company to improperly misrepresent its business operations and prospects and they failed to correct the Company's public statements and corrupt stock promoters' public statements about the Company.   The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.   Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of ForceField's securities and disguising self-dealing transactions.

149.    The Individual Defendants had actual or constructive knowledge that that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls.   The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them.   Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of ForceField's securities and engaging in self-dealing transactions.

150.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

151.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, ForceField has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## SECOND CLAIM

### Against Individual Defendants for Unjust Enrichment

152.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

153.   By their wrongful acts and the omissions of material fact that they caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, ForceField.

154.   The Individual Defendants either benefitted financially from the improper conduct and received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from ForceField that was tied to the performance or artificially inflated valuation of ForceField, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

155.   Plaintiff, as a shareholder and a representative of ForceField, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of ForceField, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to ForceField;

(c)     Determining and awarding to ForceField the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing ForceField and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect ForceField and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1.  a proposal to strengthen the board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2.  a provision to permit the shareholders of ForceField to nominate at least three candidates for election to the board; and

3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

- 51 -

(e)     Awarding ForceField restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: May 6, 2015                         Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

By:     /s Timothy W. Brown

Timothy W. Brown, Esq.
Email: tbrown@thebrownlawfirm.net
127A Cove Road
Oyster Bay Cove, New York 11771
Telephone: (516) 922-5427

*Counsel for Plaintiff*

<u>VERIFICATION</u>

I, Neil Brown am the plaintiff in the within action and am a citizen of the State of Utah. I have read the foregoing complaint and know the contents thereof. The allegations of the complaint are true of my personal knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this ___ day of May 6, 2015.

_____

Neil Brown